Argued July 10, affirmed October 2, 1923.

FREDENBURG *v.* HORN ET AL.

(218 Pac. 939.)

</div>

**Frauds, Statute of—Bill cf Sale not Required to Express Consideration.**

1. A bill of sale was not unenforceable because of failure to express the consideration, since Section 808, paragraph 5, Oregon Laws, requiring an agreement for the sale of personal property at a price not less than $50 to express the consideration, was repealed by Session Laws of 1919, page 96, Section 4 (Section 8168, Or. L.), re-enacting the statute of frauds, without requiring the agreement or the note or memorandum to express the consideration, in view of Section 77, repealing inconsistent acts.

**Frauds, Statute of—Bill of Sale not Inadmissible Because of Failure to Express Consideration, in Absence of Evidence as to Statutes of State in Which It was Executed.**

2. In the absence of evidence as to the statutes of the state in which a bill of sale was executed, the court will not exclude the bill of sale for failure to express the consideration, since, if the *lex loci contractus* prevails, the English statute of frauds did not require the contract to express the consideration, and, if the *lex fori* prevails, Section 8168, Or. L., does not contain such requirement.

**Trover and Conversion—Bill of Sale Admissible to Show Ownership Though Consideration was not Stated.**

3. In an action for conversion of cattle, a bill of sale was admissible to prove ownership in plaintiff, though the consideration therefor was not stated, since the action was in tort and the bill of sale was merely incidental to question of ownership and right to possession.

**Evidence—Witness Could not Testify as to Why Other Person Wanted a Matter Kept a Secret, in Absence of Testimony as to Declarations Giving Reasons.**

4. A witness, who testified that a certain person had told him to keep a matter a secret, could not testify as to why such person wanted the matter to be kept a secret, in the absence of testimony as to declarations by such person giving reasons therefor.

**Trover and Conversion—Written Demand Held Admissible, Though It Described Defendants as Executors.**

5. In an action against defendants, individually and not as executors of an estate, for conversion of cattle, in which it was undisputed that the plaintiff had demanded the property from the defendant's agent and had been refused possession, the admission in evidence of plaintiff's written demand on defendant, was not error, though it described them as executors.

**Trover and Conversion—Evidence as to Price Received by Wrong-doer Selling Property Inadmissible.**

6. In an action for conversion, evidence as to the price defendants had received for the property is inadmissible.

**Trover and Conversion—Damages Reasonable Market Value.**

7. The owner of converted property can recover the reasonable market value thereof, regardless of price received by the wrongdoer.

**Executors and Administrators—Evidence Executors Paid Proceeds Over to Estate Irrelevant on Question of Individual Liability for Conversion.**

8. In an action against defendants, individually, for conversion of cattle, evidence that the defendants sold the cattle as executors, believing the cattle to have been property of the estate, and that they paid proceeds over to the estate, was irrelevant.

**Evidence—In Action for Conversion, Declarations as to Ownership Held Properly Excluded as Self-serving.**

9. In an action for conversion of cattle against defendants who claimed that the cattle had been a part of an estate of which they were executors, testimony as to declarations of the decedent as to his ownership of the cattle, not shown to have been made in

5. In what capacity an executor or administrator may be sued for his personal tort, see note in 51 L. R. A. 261.

connection with the conversion so as to constitute a part of the *res gestae,* was properly excluded as self-serving.

**Trial—Refusal of Requested Instruction Partly Good and Partly Bad not Error.**

10. It was not error to refuse an instruction which was in part good and in part bad, since the court was not required to segregate the good from the bad.

**Witnesses—Statute as to Evidence of Statements of a Deceased Held not Available to Executors Being Sued Individually— "Party."**

11. Section 732, subdivision 2, Or. L., providing that, when a "party" to an action for or against an executor offers evidence of statements made by deceased against the interest of the deceased, statements of deceased concerning the same subject matter in his own favor may be proven, *held* not available to executors being sued in their individual capacity, since a statute being in derogation of common law should not be extended beyond its terms by construction or implication.

**Evidence—Declarations of Ownership Held Inadmissible for Failure of Questions to Fix Date of Declarations.**

12. In an action for conversion of cattle in which the plaintiff claimed under a bill of sale by defendants' testator as against defendants' contention that the bill of sale had never been delivered, declarations of the testator as to his ownership of the cattle were not admissible, where the question propounded did not definitely fix the date of such declarations as being subsequent to the alleged delivery of the bill of sale.

**Executors and Administrators—Estate not Liable for Tort.**

13. An executor cannot render the state liable in tort.

**Appeal and Error—Truth of Plaintiff's Testimony Assumed on Appeal from Judgment on Verdict for Plaintiff.**

14. On appeal from a judgment rendered on a verdict for the plaintiff, the Supreme Court must assume that the testimony of the plaintiff and her witnesses was true.

**Trover and Conversion—Evidence Held to Prove Delivery of Bill of Sale.**

15. In an action for conversion of cattle involving an issue as to whether the bill of sale was delivered to plaintiff, testimony that former owner gave plaintiff the bill of sale, saying, "Here is your property," *held* to prove delivery.

From Klamath: D. V. KUYKENDALL, Judge.

Department 2.

This was an action to recover damages for the conversion of personal property.

The complaint set forth: That on November 4, 1919, plaintiff was the owner and entitled to the immediate possession of two red cows, known as "Rosey" and "Cherry," branded with the William Horn brand; two calves, belonging to said cows, branded with the same brand; one heifer, known as the Fredenburg heifer, and one bull calf, also branded with the same brand; two iron gray mares, branded with a quarter circle Z; one set of harness, known as the Henry Diechman harness, and one light wagon, known as the Hall wagon. That at the date aforesaid plaintiff was lawfully possessed of said property, which was of the value of $1,125. That on December 6, 1919, defendants willfully and unlawfully took and carried away said property and converted it to their own use. That demand for the return of the property had been made upon the defendants and been refused.

The defendants answered, denying each and every allegation of the complaint, and as a separate defense alleged that one William Horn died testate in Modoc County, California, on November 4, 1919, and that at said date and for a long time prior thereto he was and had been the owner of the property in controversy; that defendants, as his executors, took possession and held the property as the property of his estate and that said property was at all times in the control of the deceased and the executors and constitutes a part of the property of the estate.

The reply of plaintiff put at issue all the new matter in the answer.

There was a jury trial and a judgment against the defendants for $710. Defendants appeal and assign the following errors:

(1) The refusal by the court to sustain an objection to a bill of sale of the property in question to plaintiff and signed by the deceased.

(2) The refusal by the court to admit the witness Elliott to answer the following question, as disclosed by the following excerpt from the testimony:

"Q. Now, when Mr. Horn called you in to draw up the bill of sale, did he state to you that you were to keep the matter a secret—that he didn't want anyone to know about it?

"A. Yes, sir.

"Q. Who heard him tell you that?

"A. My brother.

"Q. Do you know why he told you that?"

(This last question was objected to as a conclusion and the objection was sustained.)

(3) The overruling by the court of defendants' objection to the introduction by plaintiff of a written demand for possession of the property, which demand was directed to John S. Horn and Dewey D. Horn, as executors of the estate of William Horn, deceased.

(4) The refusal by the court to permit John S. Horn to testify the amount received at a sale of some of the cattle.

(5) The refusal of the court to permit defendants to testify what disposition was made of the money received at such sale.

(6) That the court erred in holding that the defendants could not offer declarations of the deceased as to his purpose in giving the bill of sale. (This question was presented in sundry different forms, with similar rulings and exceptions in each instance. It will be more fully stated and covered in the opinion.)

(7) The court's refusal to sustain defendants' objection to the introduction of the bill of sale in evidence.

(8) The refusal of the court to sustain defendants' motion for a judgment of nonsuit.

(9) The refusal of the court to give the following instruction requested by defendants:

"If you find from the evidence in this case that the bill of sale, Exhibit 'A,' was not delivered by William Horn to the plaintiff in William Horn's lifetime, the said bill of sale would be null and void and plaintiff could not recover the value of the property mentioned therein or in this action."

The facts, as disclosed generally by plaintiff's testimony, indicate that during the year 1919 plaintiff, who was then Emma Fredenburg and who has since this action was commenced remarried and is now Emma Fredenburg Martin, resided near the ranch of William Horn, located in Modoc County, California, near the line between Modoc County, California, and Klamath County, Oregon; that Horn was a bachelor, engaged in stock-raising; that for a period of several years prior to the commencement of this action Emma Fredenburg had been employed at frequent intervals for the purpose of keeping house for William Horn and doing chores incident to such work on a farm. The evidence indicates that she did a great deal of the purchasing of household necessities for the deceased during his lifetime.

During the years 1917 and 1918 she had purchased a cow, called in the testimony the Fredenburg cow, which cow gave birth to two calves, one described on the pleadings as a roan heifer, known as the Fredenburg heifer, and one roan bull calf. It was claimed that, having no brand of her own and during the year 1918 when she went to Medford, Oregon, to at-

tend the funeral of her son, Mr. Horn placed his brand upon these animals before they were turned out on the range in order to protect them for Mrs. Fredenburg, and that this was done with Mrs. Fredenburg's knowledge and consent.

On November 4, 1919, William Horn died from cancer of the stomach. This affliction had been coming on him for some time and Mrs. Fredenburg during this year was again in his employ for several months, doing the housework, feeding the hogs and doing other necessary chores, and nursing the deceased during a period of several months immediately preceding his demise. Approximately three months before the death of William Horn he left for Portland, Oregon, where he took treatment for several weeks and during this period Mrs. Fredenburg remained upon his ranch doing the housework and looking after the ranch and after his return she remained at his home until his death, doing the housework and assisting in the care of the deceased.

On August 3, 1919, and prior to the date on which Mr. Horn left for Portland, he directed that a bill of sale, conveying to Mrs. Fredenburg the personal property here in dispute, be prepared by one George E. Elliott. This bill of sale, as prepared, contained a description of the heifer known as the Fredenburg heifer and the roan bull calf. Both these animals are claimed by Mrs. Fredenburg already to have been her property, as heretofore stated. The bill of sale is as follows:

"Modoc Co., Aug. 13, 1919.

"I, the undersigned, this day bargain and sell unto Emma Fredenburg the following described property: Two red cows known as Rosey and Cherry and their two calves, known as the Horn brand, also one roan

heifer known as the Fredenburg (heifer) and one roan bull calf about one year old, brand with horn. Two iron gray mares now in possession of Charley Moppin branded with the quarter circle Z. One set of harness, same known as the Henry Diechman harness. One light wagon known as the Hall wagon.

"WILLIAM HORN.

"Witness:
    "GEORGE E. ELLIOTT.
    "J. T. HORN."

William Horn placed the bill of sale in the hands of Elliott with instructions that in case he did not return alive Elliott should deliver the bill of sale to Mrs. Fredenburg and that in case he did return alive it should be returned to him. He returned alive but in an incurable condition and Elliott returned to him the bill of sale, which he placed under a cover on a stand by his bedside. In answer to a question from Mr. Elliott whether he, Elliott, should destroy the bill of sale William Horn stated that he, himself, would attend to that matter.

Approximately ten or twelve days before his death Mrs. Fredenburg claims that he delivered this bill of sale to her, saying at the same time, "Here is your property." He was normal mentally at this time, was able to be up and around the house at short intervals, and was seated on the edge of a couch at the time it is alleged that he delivered this bill of sale to Mrs. Fredenburg. The fact of the delivery was also testified to by a neighbor, Mr. Mendenhall, who claims that he was present and who in every respect corroborated Mrs. Fredenburg's statements.

On the other hand, the deceased's nephew and brother testified that one or the other of them was with the deceased every moment of the time for two weeks before and up to his death and expressed the

opinion that it was impossible for such a delivery or conversation to have taken place without their knowledge.

After the death of William Horn, Mrs. Fredenburg was paid by the executors all that she claimed was due for her services and receipted for the same but testified on the trial that this was only for services from the first day of October and that all other services had been previously paid for by the transfer of the property mentioned in the bill of sale. After the death of William Horn and a few days after the funeral Mrs. Fredenburg called at the ranch with the intention of taking away the property mentioned in the bill of sale. She found one Daniel Horn in possession, as agent for the defendants as executors, and exhibited to him her bill of sale and he refused her possession. Later and just prior to instituting this action she made a written demand, directed as follows, "To John S. Horn and Dewey D. Horn, executors of the last will and testament of William Horn, deceased," and later her attorney made a demand in her behalf upon each of the defendants personally. In all these instances the return was refused.

Affirmed.

For appellants there was a brief and oral argument by *Mr. J. N. Carnahan.*

For respondent there was a brief and oral argument by *Mr. H. M. Manning.*

McBRIDE, C. J.—1. As to the contention that the bill of sale was improperly admitted because it did not contain a reference to any consideration, we are of the opinion that the objection is not well taken. Section 808, paragraph 5, Or. L., reads as follows:

"Section 808. Agreement not in Writing, When Void.—In the following cases this agreement is void unless the same or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party to be charged, or by his lawfully authorized agent; evidence, therefore, of the agreement shall not be received other than the writing, or secondary evidence of its contents, in the cases prescribed by law: * *

"5. An agreement for the sale of personal property at a price not less than $50 unless the buyer accept and receive some part of such personal property, or pay at the time some part of the purchase money; * * *"

Section 8168, being Section 4 of Chapter 91 of the General Laws of Oregon of 1919, is as follows:

"Section 8168. Statute of Frauds.—(1) A contract to sell or a sale of any goods or choses in action exceeding the value of $50 shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf.

"(2) The provisions of this section apply to every such contract or sale, notwithstanding that the goods may be intended to be delivered at some future time or may not at the time of such contract or sale be actually made, procured or provided, or fit or ready for delivery, or some act may be requisite for the making or completing thereof, or rendering the same fit for delivery; but if the goods are to be manufactured by the seller especially for the buyer and are not suitable for sale to others in the ordinary course of the seller's business, the provisions of this section shall not apply.

"(3) There is an acceptance of goods within the meaning of this section when the buyer, either before or after delivery of the goods, expresses by words

or conduct his assent to becoming the owner of those specific goods.''

Section 8168 is a part of Chapter 91, Session Laws of 1919, and Section 77 of that act repeals all acts inconsistent with it. As the later section purports to be complete in itself and eliminates the words ''expressing the consideration,'' it is inconsistent with the previous section, which was thereby repealed. This was expressly held in *Eigen* v. *Rosolin,* 85 N. J. L. 515 (89 Atl. 923). In *Friedman* v. *Plous,* 158 Wis. 435 (149 N. W. 218), the court seems to have assumed for the purposes of the argument that both statutes were in force and that, conceding this, plaintiff in that case was excluded by the terms of both, but the question of the conflict of the statutes does not appear to have been raised or considered. We are satisfied that the words ''expressing the consideration'' do not exist in our statute at the present time.

2. Counsel for defendants ingeniously contends that, as this bill of sale was executed in Modoc County, California, and no evidence was introduced as to what the statutes of California are on this subject, we must assume that the English statute of frauds (29 Car. II, Chap. 3) prevails there and that, under the doctrine that a contract is to be construed according to the *lex loci contractus,* it must express the consideration. The English statute of frauds did not expressly require the consideration to be expressed and it was one hundred and eight years after it was passed and long after our Revolution before Lord Ellenborough, in *Wain* v. *Walters,* 5 East, 10, so construed the word ''agreement'' in that statute as to hold that it was necessary to state the consideration in the memorandum. Some of the states, notably

New York, shortly after this decision held with Lord
Ellenborough's construction, but the weight of au-
thority and the best considered cases refuse to follow
the doctrine so enunciated and hold that, in the
absence of a statute requiring it, a statement of the
consideration is not necessary in the memorandum:
*Sage* v. *Wilcox,* 6 Conn. 81, is a leading case on the
subject. In line with this decision are: *Smith* v. *Ide,*
3 Vt. 290; *Packard* v. *Richardson,* 17 Mass. 122 (9
Am. Dec. 123), and other cases; but the reasoning in
those above cited seems to us to be conclusive. In
addition to this, if, as contended by Mr. Browne in
his work on the Statute of Frauds, the statute is a
prescription of a rule of evidence, the *lex fori* and
not the *lex loci contractus* will prevail; but it is un-
necessary to pass upon this point in the present con-
tradictory condition of the authorities, as, in view
of what we consider the best American authorities,
it is not necessary that the consideration be stated
in the memorandum where, as in Section 8168, *supra,*
it does not occur. The very omission of the phrase
"expressing the consideration" in Section 8168 when
it existed in Section 808 is, in itself, a strong sug-
gestion that it was the actual intent of the legislature
to dispense with these words.

3. It is also urged that, as the consideration was
neither shown by the instrument itself nor pleaded,
the court erred in admitting it, and authorities are
cited to the effect that in an action upon a written
contract, if the contract itself does not state a con-
sideration, it should be pleaded in the complaint.
The rule is correctly stated, but it should be remem-
bered that this is not an "action upon a contract"
but for wrongful conversion, which is a tort. In
*Austin* v. *Vanderbilt,* 48 Or. 206, 207 (85 Pac. 519,

120 Am. St. Rep. 800, 10 Ann. Cas. 1123, 6 L. R. A. (N. S.) 298), Mr. Justice MOORE, quoting the words of Mr. Justice ROBERT S. BEAN in *Miller* v. *Hirschberg,* 27 Or. 522 (40 Pac. 506), says:

"The material averments in an action of this character are ownership and right to the possession in plaintiff, and that the defendant wrongfully took and converted the property in question to his own use, or that, being lawfully in possession thereof, he so converted it."

The question in the case at bar was the ownership, the right to possession and the conversion of the property. The bill of sale was merely incidental to the main question as a matter of evidence tending to show plaintiff's right to such possession.

4. Error is also predicated upon the refusal of the court to permit the witness Elliott to answer the question heretofore quoted in the statement. The court was correct in its ruling. Elliott could not know why the deceased wished the execution of the bill of sale to be kept secret except from his declarations and there was no question asked as to whether he made any declarations of his reason; in fact, the whole of the evidence indicates that he did not.

5. Another alleged error was the ruling of the court permitting the introduction of evidence of a demand made upon John S. Horn and Dewey D. Horn as executors, as recited in the statement. The evidence is conclusive that they had the property; in fact, they admitted it. It is also conclusive and not denied, that Mrs. Fredenburg demanded the property from their agent and was refused. The fact that when the written demand was made upon them they were described as executors makes no possible difference and it was no matter under what title they

proposed to hold if they knew that she claimed the property and required its delivery to her.

6, 7. Another alleged error was the refusal of the court to permit evidence by defendants of what part of the property sold for and what disposition was made of the money. We do not see how this could be material. The plaintiff's loss would be neither greater nor less by reason of the price which defendants received. The rule in cases of this character is that the wrongdoer must pay the reasonable market value of the property converted, and that is not to be estimated by the price for which it was sold. If such were the case it would encourage trespass upon personal property and sales at small value, which is against the policy of the law. Counsel for appellants cite, in favor of this contention, *Moore* v. *Lachmund,* 59 Or. 565 (117 Pac. 1123, Ann. Cas. 1913C, 1273). That case was a sale by the sheriff under execution and the authorities hold, and that case held, that evidence of the amount received at such a sale is *some* evidence of its value. Neither the principal case nor those cited in the opinion go further than this. There seems to be a presumption in favor of the fairness of official sales at public auction, which neither in law nor logic attaches to a private sale made by a wrongdoer.

8. Neither did the court err in excluding evidence as to what the defendants did with the money obtained at this sale. If they sold the property, believing it to have been the property of the estate, the probate court will, no doubt, upon a showing made, return to them such amount of money as they have paid over to the estate, but the capacity in which they were acting when they sold the property or what they

did with the money is not in any way relevant to the issues in this case.

9. It is alleged that the court erred in sustaining the objections made to testimony as to declarations of the deceased that he was the owner of the property. Considered as a part of the *res gestae* they are not shown to have been made at a time coincident with the prinicpal act or in connection with any conversation detailed by plaintiff's witnesses; otherwise they were purely self-serving, if made at all. There was no error committed in this respect.

10. The instruction objected to and quoted in the statement was unsound for the reason that title to part of the property alleged to have been converted was not dependent wholly upon the bill of sale but upon evidence of a title obtained prior thereto. If it had been confined solely to property claimed by virtue of the bill of sale it would have been error to refuse it, but when a request for an instruction complete in itself is partly good law and partly bad it is not obligatory upon the court to segregate the good from the bad, and it is not error to refuse it wholly. We find nothing in the remarks of the court that could possibly have prejudiced defendants' case or indicated any opinion on the evidence.

11–13. It is urged with great earnestness that defendants should have been permitted, under subdivision 2 of Section 732, Olson's Oregon Laws, to testify to declarations made by deceased in the late period of his sickness that the property in question was his. That part of subdivision 2 which defendants' counsel claims is applicable to this case is as follows:

" * * provided, that when a party to an action, suit or proceeding by or against an executor or administrator appears as a witness in his own behalf, or offers evidence of statements made by deceased

against the interest of the deceased, statements of the deceased concerning the same subject matter in his own favor may also be proven."

It is contended that the defendants, being in fact executors, although not proceeded against as such, were entitled to the benefit of this provision. It may be answered, first, that the questions propounded did not definitely fix the date of such declarations as being subject to the alleged delivery of the bill of sale; and, second, that this statute, being in derogation of the common law, should not be extended beyond its terms by construction or implication. We take it that when the statute speaks of a "party" it refers to a party to the record,—a plaintiff or a defendant. The defendants were not parties to the record in their capacity as executors. Indeed, this being an action *ex delicto,* they could not have been, as it is not in the power of an executor, as such, to render the estate for which he acts liable in tort: 18 Cyc. 883, 884. See *Elmore* v. *Elmore, Exr.,* 58 S. C. 289 (36 S. E. 656, 51 L. R. A. 261), the notes to which cover all the law on the subject.

It is true that the plaintiff might have brought an action against the defendants in their representative capacity for money had and received for the proceeds of that portion of the property which had been sold and the proceeds turned over to the estate, but such an action would have been but a partial and inadequate remedy.

*Penny* v. *Croul,* 87 Mich. 15 (49 N. W. 311, 13 L. R. A. 83), is cited by counsel for defendants in support of his contention, but so far as it seems to sustain it we cannot follow it. The statute considered in that case provided, in substance, that:

"When a suit is prosecuted or defended by the heirs, assigns, devisees, legatees or personal representatives of a deceased person, the opposite party, if examined as a witness on his own behalf, shall not be permitted to testify at all to matters which, if true, must have been equally within the knowledge of such deceased person."

(The quotation above is from the syllabus in 49 N. W.)

Penny, the administrator of the estate of Phillinda Hurlbut, deceased, who was the wife of Chauncey Hurlbut, deceased, brought an action against Jerome Croul personally to recover the value of certain bonds which he alleged were placed in defendant's hands for safekeeping, to be redelivered to her on demand, and which it was alleged defendant refused to redeliver. The defendant answered, claiming that he held the bonds as executor of the estate of Chauncey Hurlbut, deceased, and for his estate. On the trial Mary Ann Williams, who was an heir of Phillinda Hurlbut, testified on behalf of plaintiff to facts relative to the ownership of the bonds, which facts must, necessarily, have been known to Chauncey Hurlbut, deceased; and Mrs. Williams and daughter also testified to an alleged conversation between defendant and Phillinda Hurlbut, deceased, as to the redelivery of the bonds. Croul, the defendant, was not allowed to contradict these conversations on the ground that he was an opposite party. The appellate court held that he, being an executor, was not the real party in interest and that the real parties were the *estates* of Chauncey Hurlbut and Phillinda Hurlbut. Having by this peculiar logic treated the two estates as entities, they held that Mary Ann Williams, being an heir to the estate of Phillinda Hurlbut, was incompetent to testify and that Croul, being merely an

executor and holding the property as such, was *not* an opposite party within the meaning of the law and could testify,—his testimony having been excluded by the trial court.  It was evidently one of those hard cases that tend to make bad law and was rendered by a divided court,—three members holding for reversal and two for affirmance.  The opinions on both sides of the controversy are able and plausible, but we are inclined to adopt the view of Chief Justice CHAMPLIN, who wrote for the minority and held to the doctrine that when the law used the term "opposite party" it was meant to refer to a party to the record.

Our own Code has never in any instance used the term "party to an action" or "parties" with any other meaning than that implied by the words "plaintiff" or "defendant" and we do not believe it has done so in this instance.

14, 15.  Taking the evidence as a whole, it is apparent that when the deceased executed the bill of sale it was in his mind that at his death the plaintiff should have this property.  His refusal to have Elliott destroy it when it was returned to him was some indication that he still had it in his mind to make it effective.  The question of the actual delivery of the bill of sale was fairly tried out and in spite of the fact that the Horns considered it impossible that the delivery and accompanying conversation could have occurred the jury found differently and in favor of plaintiff.  Most of the property was out upon the range, only an animal or two being on the pasture of deceased, which pasture may have, for all that appears, contained anywhere from one acre to thousands of acres.  In his condition, taken in connection with the giving of the bill of sale, he made the only delivery of the property that was reasonably

108 Or.—44

feasible under the circumstances: Giving her the bill of sale and saying, "Here is your property." Assuming the testimony of plaintiff and her witnesses is true, which we must after verdict, the deceased, even if now alive and the defendant in this action, could not successfully defend against an action in replevin or for conversion. The value of the property may seem large in proportion to the alleged services rendered and it may be possible that some element of generosity and regard entered into the transaction, but deceased had a right to be generous as well as just.

Finding no reversible error, the judgment is affirmed.                                        AFFIRMED.

BEAN, BROWN and McCOURT, JJ., concur.